**GEORGE FREITAS DAIRY, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**HENRY COSTA JR. DAIRY, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

Civ. Nos. 73-3789, 73-3790.

United States District Court, D. Hawaii.

Jan. 23, 1976.

William W. Saunders, Saunders & Morse, Honolulu, Hawaii, for plaintiffs.

Harold M. Fong, U. S. Atty., Honolulu, Hawaii, Robert Livingston, Dept. of Justice, Tax Div., Washington, D. C., for defendant.

## OPINION

WONG, District Judge.

At all times mentioned herein, plaintiffs were corporations (unless otherwise indicated) engaged in the production of dairy products, including raw milk. On its federal income tax return for the calendar year 1967, plaintiff Henry Costa Jr. Dairy, Inc. (Costa), claimed and the Commissioner of Internal Revenue disallowed an alleged loss of $116,183.33 for cancellation of a milk-production contract. A similar loss claim for 1967 was made by plaintiff George Freitas Dairy, Inc. (Freitas) in the amount of $50,000, which was also disallowed. These suits were instituted after the filing of formal claims for refund by each plaintiff and the issuance of notices of disallowance to them. Defendant contends that no loss was sustained by either plaintiff in 1967. This Court disagrees with defendant.

At the beginning of 1967, there were two main dairies processing milk for distribution in Hawaii, Meadow Gold Dairies, Hawaii Ltd. (Meadow Gold) and Foremost Dairies, Hawaii Ltd. (Foremost). The producing farmers (producers) were members of either a Foremost or a Meadow Gold pool under which they or their predecessors had entered into agreements with one or the other proc-

essor and which established their particular production quotas from year to year or over a term of years.

In the case of Foremost, the producers had entered into buy-sell agreements with the quantity of production quota being reviewed annually. However, in the case of Meadow Gold, a portion of the net profits from prices established by formulas was returnable to the producers in accordance with their production quotas.

Sometime in 1966, cuts in quota were imposed by at least Meadow Gold due to the reduction in demand of milk because of the pull-out of military troops from Hawaii and the introduction of imitation milk. The producers consequently became unhappy with their contracts. A series of disputes between the producers and the processors ensued.

In February 1967, for the first time, the producers in the Foremost pool banded together with the producers in the Meadow Gold pool and decided to market their milk through a co-operative. A letter cancelling the producers' contracts was delivered to the attorney for Meadow Gold on February 27, 1967. Cancellation of the contracts was promptly accepted by Meadow Gold. A similar letter of cancellation was also sent to the attorney for Foremost. Foremost, however, initially took the position that it had "a valid existing contract" with the farmers. It sued for an injunction requiring delivery of milk to Foremost. After a temporary restraining order was dissolved by the Circuit Court of Hawaii, Foremost dismissed its suit and acquiesced in the cancellation.

After termination of the contracts, Meadow Gold entered into new contracts with six to eight producers who were able to supply almost all of the milk needed by Meadow Gold. As a result, the other producers, members of the co-operative, were unable to dispose of their milk. Violence ensued and, as a result, cows were poisoned. Public officials became concerned over the "milk wars" and the legislature passed "The Hawaii Milk Control Act" (Act 260, Sess. Laws Haw.1967), which was signed on June 7, 1967.

On July 4, 1967, the Board of Agriculture issued an order which was designated as "Division of Milk Control. Emergency Price and Quota Order No. 1." This order established daily production quotas for producers in the Honolulu Milk Shed (the Island of Oahu) and was subsequently amended from time to time. Plaintiff Costa was assigned a daily quota of 85.14 cwt. Plaintiff Freitas was assigned a daily quota of 110.94 cwt.

Immediately preceding the cancellation of the contracts, Costa had a daily production quota of 60 cans, which were the equivalent of 40 gallons per can, or a total of 2,400 gallons daily. Expressed in hundredweight, 60 cans were equivalent to 51.6 cwt. Freitas had a daily production quota of 80 cans with Meadow Gold, or the equivalent of 68.8 cwt. Thus, Costa's production quota was increased by the State of Hawaii from 51.6 cwt. to 85.14, while Freitas' was increased from 68.8 cwt. to 110.94 cwt.

The production quotas established by the State were based not on the quotas the producers had under their contracts with the distributors prior to their cancellation but were based on actual three-year average production prior to January 1, 1967. Whereas the private quotas were established by contracts and were assignable, albeit usually only upon sale of a farm, the quotas established by the State were conferred by the State and could be reduced by it. The State-granted quotas were also assignable, with the consent of the State.

Section 165 of the Internal Revenue Code of 1954 and the pertinent interpretative Treasury Regulations allow as a deduction any loss sustained by a taxpayer during the taxable year which is not compensated for in any form. The question raised here is whether the plaintiffs sustained losses during the year 1967 when their private milk production quotas were terminated by cancellation of their contracts with the distributors.

The standard for determining the year for deduction of a loss is a flexible, practical one, varying according to the circumstances of each case. The test is a practical, not a legal, one. *See Boehm v. Commissioner,* 326 U.S. 287 at 292–93, 66 S.Ct. 120, 90 L.Ed. 78 (1945), citing *Lucas v. American Code Co.,* 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538 (1930).

Looking at all the pertinent facts and circumstances of the instant case, it is clear that at the time of cancellation of the contracts, the plaintiffs' production quotas became worthless. This occurred in late February 1967, in the case of Freitas' contract with Meadow Gold, and shortly thereafter in the case of Costa's contract with Foremost. Although both plaintiffs eventually received larger production quotas from the State (Department of Agriculture), it is necessary to keep in mind the status of the taxpayers at the time of the cancellation of the contracts. This cancellation was the "identifiable event" that evidence the closed and completed transaction occurring in the taxable year. *See Treas.Reg.* § 1.165–1(d)(1) (1964).

At the time these fixed events occurred, taxpayers could not have anticipated that legislation would eventually be passed, or that they would be conferred production quotas by the State. The State quotas were allocated not on the producer's previously existing private quota but were based on the three-year average of actual production prior to January 1, 1967. These quotas may be amended by the State "to meet changes in conditions, such as change in demand or inability of certain producers or producer-distributors to meet their assigned quotas." § 23(d), Act 260 S.L.H.1967.

There is no assurance that the State will not, sometime in the future, repeal the law and cancel all quotas. Should this happen, no tax-deductible loss will be sustained by the producers. Aside from the fact that no payment was made to the State for the quotas, revocation of the quotas by the State will not result in a deductible loss so long as the right to produce by the producer contin-

ues. *Consolidated Freight Lines, Inc. v. Commissioner,* 101 F.2d 813 (9th Cir.), *cert, denied* 308 U.S. 562, 60 S.Ct. 73, 84 L.Ed. 472 (1939); *Reporter Pub. Co. v. Commissioner,* 201 F.2d 743 (10th Cir.), *cert. denied* 345 U.S. 993, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953). Thus, should it be held that the loss of the private quotas is not now deductible for the reason that taxpayers received higher governmental production quotas, they would also be faced with the problem of non-deductibility upon the lapse of the government quotas.

This Court turns next to the issue of the amount of losses sustained by each plaintiff. Costa acquired its production quota of 60 cans over a number of years at a total cost of $80,000. The accumulated amortization on the 10 cans acquired in 1958 was $2,916.67. No further amortization was allowed by the Commissioner of Internal Revenue. The adjusted basis of its production quota was therefore $77,093.33. It is therefore determined that plaintiff Costa sustained a deductible loss of $77,093.33 for the calendar year 1967.

Freitas' predecessors, George and Mary Freitas, acquired from one Paul Heckenlively a dairy farm for an aggregate price of $155,000 on February 2, 1959. There was, however, no allocation made of the purchase price to the production quota acquired with the purchase, although the leasehold improvements, dairy equipment, and livestock were itemized in the bill of sale. Freitas (then a partnership) attempted to amortize the cost of the production quota for the calendar years 1960 and 1961. These amortizations were disallowed as deductions by both the Commissioner of Internal Revenue and the State Tax Director.

For the taxable year ended May 31, 1967, Freitas attempted to deduct the portion of the purchase price allocated to the production quota. The Revenue Agent's Report admitted that: "The taxpayer purchased its quotas prior to the years under consideration for a total consideration of $50,000.00." (Rev. Agent's Report 4.) Deduction was denied not be-

cause of failure on the part of the taxpayer to prove its adjusted basis for the quota, but because it was determined that no deductible loss was sustained under § 165, IRC 1954. The agent took the position, subsequently adopted by the Commissioner of Internal Revenue, "that there was no real abandonment of the contract but simply a modification in its terms and hence no loss is deductible." (RAR 4.) It is this Court's conclusion that Freitas sustained a deductible loss in the amount of $50,000 for the taxable year ended May 31, 1967.

Accordingly, a proposed judgment shall be submitted by the Commissioner of Internal Revenue entering judgment in favor of plaintiffs and against defendant, allowing a deductible loss for plaintiff Costa in the amount of $77,093.33 for the calendar year 1967, and for plaintiff Freitas in the amount of $50,000 for the taxable year ended May 31, 1967. The proposed judgment shall indicate the amounts to be refunded to the respective plaintiffs.